Good morning, gentlemen of the Court. Good morning. We are going to use our brief time of the indulgence of the Court to divide this argument between me and my partner, Mr. West. I intend to argue two points, the error in sanctioning a Penal Trial Counsel and the error and the need in this case, under rare circumstances, to remand the case to be tried before a different district judge. When the district court sanctioned Mr. Gonzales, it believed that it was required, it required Mr. Gonzales to appear personally. In fact, that is incorrect. The law has been established since the days of the Marshall Court that a response to an order of show cause can be made by counsel rather than the person who is allegedly to be sanctioned. He did not appear personally. He appeared by counsel. That is entirely appropriate. The only time that a lawyer must appear personally under such circumstances is if an order is directed especially to him. That was not true in this case. And therefore, the sanctioning of Mr. Gonzales was entirely improper. It's pretty risky, isn't it, on the part of counsel where they've been asked to appear at a show cause hearing that relates to their own particular conduct at trial not to appear? It may be a risk, but it's not sanctionable. In this instance, he was well represented by counsel. He had already made plain that he could be available by telephone. He was engaged in another matter that morning, and he did not appear personally. But he was well represented by his own counsel, and that should be the end of it in terms of sanctions. He was aware, I take it, that the OSC against him was, in fact, one of the items to be discussed at that day's hearing? Yes. So there's no issue of notice? No. Now, was there any finding of bad faith? No. Is that material? No, I don't think it was. It was never mentioned at all for good reason because there wasn't any. Well, is the absence of such a finding material? It is not because, as I say, since the days of John Marshall, a response by a lawyer to an order show cause can be made by counsel on his behalf, absent a direct order to that lawyer by the court that he is directed to appear. So you're relying entirely on that aspect and not the absence of a bad faith finding? I think it is both. It's undoubtedly absence of bad faith, which goes without saying because there was never any suggestion, whatever, that Mr. Gonzales acted in bad faith. Generally, our case law suggests that there has to be a finding of bad faith. If there's no appearance. Well, I mean in terms of the... All right. Okay. The second issue, I shall not argue the fees and costs issue. My partner, Mr. West, will argue that. You're going to address the signing to a different district judge. As you know from your own experience, that is a very unusual process. It is. It is very unusual. But this is a very unusual case. From the very threshold of this case, the district judge was not hospitable at all. He erred even in pretrial by dismissing incorrectly the negligence count of the complaint. Well, that normally we don't reassign cases because there's a disagreement over the merits of the judge's rulings. But there's a great deal more here. The court's egregious error in disrupting the deliberations of the jury to instruct them also incorrectly that Mrs. Mendes had no damages after March 3. That was the date, Your Honor, on which Mrs. Mendes was released from improperly being incarcerated in jail. That was a jury question entirely and not a matter upon which the court could instruct the jury. Well, again, that's maybe legal error. It's not clear that it's cause for — No, it's not. You're quite correct. But there's a great deal more. As the court is aware from the record, the district court refused to enter judgment in this case, although repeatedly asked to do so. It took not one but two orders from this court pursuant to petitions for writs of bandanas before the court ever entered a judgment. Under these circumstances, it is quite clear that the court could not erase its previously held views in this civil rights case. Indeed, there is authority cited in the brief that inordinate delay in entering a judgment in itself is enough to require assignment to a new judge on remand. Okay. I will now turn the matter over to my partner to discuss the gross error in refusal of all fees and costs in this case. Okay. Your Honors, may it please the Court. My name is Tony West on behalf of the appellant, Mrs. Mendes. And with the Court's permission, I'd like to touch briefly on the issue of the erroneous jury instruction and then move quickly to a discussion of the outright denial of fees. You're the one who showed up in lieu of your partner. That must have been a fun day. It was an interesting day, to be sure. But with regard to the jury instruction, what we have here is the record demonstrates that the actions of the district court was simply unprecedented. Not only did the district court take what is quintessentially a factual issue away from the jury on the issue of damages, despite there being sufficient evidence to allow the jury to do its fact-finding mission. Well, that seems to be the problem that the district court had. The court seemed to believe there wasn't enough evidence to support anything other than what the instruction said. So why don't you tell us what the evidence was that would undercut what the judge thought about the case? Well, Your Honor, I think there are a few things that we can point to. First, there's the testimony of Mrs. Mendes herself in which she says that she wanted to leave the station. That was the last place that she wanted to be. In addition to that, there is testimony about the fact that she was crying at the station and tried to leave the room in which she was being detained. Excuse me, counsel. I thought the instruction we're talking about limited, told the jury that damages could not be accorded for anything that happened after she left the station. That's correct, Your Honor. That's what I've got the impression. That is correct, Your Honor. But it's our contention that based on the emotional distress suffered that day, it would be proper for the jury to infer that emotional distress lingered for some period beyond midnight of the day that she was released. Was there testimony on that point? Well, there was. There's testimony that she was taking antidepressants and, in fact, was taking them for some period of time after the incident due to her emotional state. Was the taking of antidepressants linked in an evidentiary sense to what happened to her at the station? Certainly the evidence I believe that the jury could have inferred. But it wasn't. See, that's the problem. You're asking for inferences, but there was no direct evidence. Well, Your Honor, I think that there was some evidence. Well, she asked if she'd been taking antidepressants before this incident? She was, and she the only previous period in which she had been taking antidepressants was related to postpartum depression and the birth of her child. But there was additional evidence as well. There was the fact that she cried on the stand when recounting her incarceration, the fact that she was not allowed to leave, the fact that she was not allowed to talk to her son, Angel. When she was recounting those incidents on the stand, it was certainly proper. So if you cried on the stand years later, that's enough to infer the continuation of distress such that you might get damages for it? I think, yes, Your Honor, that it is evidence of emotional distress directly tied to the trauma of that evening. And then finally, there was testimony that when she came home and found her home ransacked, that she cried uncontrollably. In fact, her husband testified that he had never seen her in quite that emotional state. I think the totality of the testimony and the evidence that was presented, and this Court has found previously that even if there is no direct medical evidence presented or other physical evidence presented with regard to emotional distress, the jury can still infer from the testimony that is given, the demeanor of the witness or not the demeanor of the witness, but from the testimony that is given, that there was emotional distress that this person suffered. It's kind of difficult to understand why, if this were the case, a few questions couldn't have been asked to tie this down rather than leaving it to vague inferences, which then resulted in the judge saying, well, there is no evidence. I mean, less than a minute, somebody could have tied that in. I understand that. But the issue here is whether or not there was any evidence in which the jury could infer that there was emotional damages that lingered beyond midnight of the night that she was released. Okay. Why don't you shift to the emotional distress you're suffering on the attorney fees. On the attorney fees. Thank you, Your Honor. Well, the law of this circuit is quite clear and unambiguous. To deny attorneys fees when there has been a clear victory by the plaintiff on at least one of her claims is an abuse of discretion. And here we have not just one, but two clear victories on constitutional claims buttressed by a jury award of punitive damages of a quarter of a million dollars. Where did this shocks the conscience test come from? It came from another circuit, because that, as this Court knows, has not been adopted here in this circuit. Right. Did he raise this sua sponte, or did somebody suggest that this shocks the conscience and that he did not? The district court raised it sua sponte. The district court did not seek to apply the prevailing law of this circuit and instead reached out to the Fourth Circuit, the First Circuit, and I believe the Seventh and perhaps the Fifth, to apply a different standard, which we contend actually contradicts the established law and standards of this circuit, particularly with the Thomas v. City of Tacoma case. Although we do have some, we have the concept of extraordinary circumstances, so are you sure the district court wasn't essentially using that rubric? Well, I don't think the district court was, for two reasons. First, the shocks the conscience standard is essentially a punitive standard. When we look at those cases, the theme that runs through all of those cases is some type of impropriety on behalf of counsel, extraordinary circumstances where, say, a first-year lawyer will bill $20 million in fees even though the case has stipulated facts, there's been no active litigation. There is something that runs through all of those cases which indicates that counsel is gaming the system, is trying to abuse the statute in some way, shape or form. There is nothing in the record here which suggests anything like that. Did the district court make any factual findings about the, quote, excessive just close court of the fees? The findings that the district court made was that there were some items that it found to be excessive. It also, I think, made some comments about the case, but the specific findings that it made was that it found that these were just so excessive that it shocked his conscience, and particularly in light of the nominal award at trial. If I could just reserve a moment or two for rebuttal, unless the Court has anything additional questions. I don't know that we do, but you have the time, so you can reserve it. All right. Thank you. Good morning. Patrick Hurley for Defendants and Appellees. I'd like to just take a quick second to address one of the issues that came up during Mr. West's argument. He testified that the husband of Mrs. Mendez testified that after the house was ransacked He argued. I'm sorry. He argued, yes, that after the house was ransacked that Tomas Mendez saw his wife crying uncontrollably. And that's actually not supported by the record. The Court, I can direct the Court to our supplemental excerpts of record in the 07 case at page 80. Mr. Mendez testified that he saw his wife as she was walking towards the house, and then he saw her crying at that time. There wasn't any testimony that I was able to find about crying uncontrollably after the search. Let's talk about the jury instruction. Didn't this have the effect of taking away fact findings from the jury invading their province? No, Your Honor, I don't believe so. The Court's instruction was consistent with the evidence that was presented at trial. You know, it's one thing to give an instruction that alerts the jury to a precise fact, that tells them that they should look carefully at the evidence to determine whether, in fact, there was injury, emotional or otherwise, subsequent to the woman's release from custody. It's another thing to do that sort of thing during the course of trial in the mix of the instructions themselves. But after the jury retires to deliberate, to drag them back and tell them flat out that there, in fact, is no proof? Now, the record may be a bit scant on this point, but it's not accurate to say that there's no proof at all, is it? Well, I think it is, Your Honor. I think that, again, going back to the test, the only evidence that was presented at trial regarding emotional distress after July 3, 2002, was crying on the stand and evidence that she was taking medication after. And this is her testimony. She was taking medication after her son was killed. Her son was shot to death, and she was brought to a police station when she was neither a subject nor a witness, correct? Correct. And you don't think there's any prospect that that would produce emotional damages beyond release from custody? Well, Your Honor, and I said correct. She was a witness. So that the jury... Oh, so she saw her own son killed. Correct. And as part of the officer-involved shooting investigation, which is considered a criminal investigation, she was considered a witness. So she was detained. No, Your Honor. Well, the jury found, actually, that she was not detained when she was transported from the location to the station. She was put in a police car for, what, two hours? No. Well, there was conflicting evidence on that, I believe, Your Honor. She said it was two hours. I believe that our evidence was that it was for, I believe it was for more like 15 minutes. But the jury found in favor of the deputy who transported her from the location to the station. And so they found that there was no false arrest by that deputy. And they also found in favor of the sergeant who was at the scene at that time. So our position is that the jury found that there wasn't a constitutional violation from the transportation issue. But there's no way the jury could have inferred, in your view, emotional damages that would have been subsequent to release from custody, even given these facts? Not in the absence of any evidence that was presented. Again, it would have been easy to have her testify about any emotional distress that she was suffering or bring in medical professionals to talk about it. But none of that was presented. And I think the district court was concerned about essentially the speculation that it would have been required for the jury to come to a conclusion that there were damages after July 3rd. And certainly the jury was free to award any emotional distress damages that it saw fit that she suffered on July 2nd and July 3rd. And there was some evidence regarding being at the station and being detained and things like that. So there was evidence that could have supported a finding of emotional distress. And I guess that moves me to my next argument, which would be the harmless error issue, which essentially the jury, by finding that there was a – there was nominal damages, the jury essentially found that the plaintiff hadn't proved that she suffered emotional distress on the July 2nd or 3rd as a result of the detention and arrest, compared to the emotional distress that she suffered from the death of her son. And the district court and the plaintiffs, I think, saw the difficulty in apportioning those damages. So once the jury finds that there was no emotional distress proven as a result of the constitutional violation, it's – there's – the jury – it's not more probable than not that the jury would have found additional emotional distress if they had been allowed to consider a longer period of time, especially in light of the absence of any evidence of emotional distress damages after that time. Can we talk about fees? Absolutely. I guess the biggest issue is the legal standard question. The – Well, I have a preliminary question for you. Was it your – did your client ever take the position that counsel was entitled to no fees whatsoever? No, Your Honor. We submitted supplemental briefing after the court raised it at the hearing on the attorney's fees. Did your client ever take the position that the fee request shocked the conscience? Well, we certainly argued in opposition to the – to the motion. You thought it was too much. You thought it should be less. But you never thought it should be zero, right? Well, that's correct, Your Honor. We – and – What did you think it should have been? Did you give it – come up with a figure yourselves? I think that the issue – or the number that we came up with was approximately 90,000 in fees and a certain amount of costs. So you agreed that would have been reasonable. Well, I – I agree, Your Honor, that the – that an award of attorney's fees in this case, the plaintiff was clearly the prevailing party. She got more than nominal damages. So this was an extreme departure from the norm. But I think the question is whether or not – not necessarily what we argued, but whether what the district court found was reasonable. The district court decided there was a forfeiture here because of shocking behavior that shocked the conscience. You forfeited your opportunity to seek fees. Well, I think that's – I think that's essentially true. I think that the court essentially said that this was an abuse of Section 1988. And in order to essentially sanction that abuse and to not encourage such abuse in the future, that a more severe reaction was needed. And what authority did the court have to take that extreme action? Well, the court had authority from the – I think from not only the U.S. Supreme Court, but also from the Ninth Circuit and the other circuits that the court relied on, the First, Seventh, Fourth, and Fifth. And it's interesting that the court relied on – Well, what's the authority from this circuit? Right. Well, the authority from this circuit is that the – that there are special circumstances when there are special circumstances. What are the special circumstances? The special circumstances – well, I think this is a case of first impression in this court, which is that does the submission of a patently excessive fee request – Well, what – I'm looking at at least the summary that I've prepared. My understanding is that they claim 2144 – 2,144 hours after the net discount that they took after write-down that you all proposed 2,000 hours as being reasonable. That was what you countered with. Isn't that right? Your Honor, I couldn't confirm those numbers, but that sounds – You can't? Well, I – Did you know this was going to be argued today? I did, but – Okay. Well, that's what your paper suggested, 2,000 – to be exact, 1,999. And I accept the course. Okay. All right. Well, I appreciate that. And then the total that you all came up with after discounting the billing rates down was $390,000. Not 90,000. It was 390,000 is what you came up with. That sounds correct. Okay. So what was before the court under the normal approach, the lodestar approach, was you all were debating the number of hours reasonably expended and what the prevailing rates would be for comparable work in the community, which is the standard. Correct. And what you countered with was for this proceeding, taking the ups and downs of successes and failures, you came out just shy of $400,000. So not only did you not argue zero fees, you actually countered with evidence before the court that, based on your judgment, would be the better alternative. So where does the court suddenly jump in and say this shocks the conscience? Under any authority, even if you look to the other circuits. What's the shocking of the conscience? Well, Your Honor, I think that the district court, and just another clarification, we actually, the lodestar that Your Honor came up with is correct. We actually had argued for a further reduction based on limited success. That's where we came up with the 90,000 that I argued. Okay. But that's the way you go about doing it, all right? Correct. But to say it shocks, I mean, where was the conscience-shocking calculation here? Their hours weren't overstated. You thought the number of hours. So what you wanted to do was discount it on result. Right. And I also just point out that we had a difficult time analyzing the hours based on the use of block billing and the vague bill. All right. Well, so block billing, you know, he discounted for that. Well, again, Your Honor, I think part of the issue is that the district court has more experience with fee requests. In fact, the district court stated during the hearing that it was the most excessive fee request that he had ever seen. And just speaking from what? Compared to what? I assume compared to other fee requests. That's what we have to assume, too. You know, it's a little difficult to review what's going on here because there wasn't any. I don't know where the disconnect came. I don't know whether it was on the billable hours or the rates. I mean, there are a lot of hours here and there are high rates. I do it, and I haven't been practicing for a long time, so it is startling. But nonetheless, when I then look at what the county puts in, then I'm saying, okay, you all have gone to the community and you've looked at the case and you thought 2,000 hours wasn't out of line, and then you argue for result. That's within the parameters. But to go from that to it's the most outrageous fee, it's a little difficult to find out where that comes from. Well, the only thing that I can say to that, Your Honor, is that I think that when the district court received the fee request, even taking into account our opposition, the district court, and I agree it was suesponsible, found that this fee request was so excessive that the district court thought that denial of the fee request was a reasonable response to that excessive fee request. And, again ---- What was wrong with their costs? The costs? Yeah. Why did they get any costs? Well, Your Honor, they sought costs based on, that were above and beyond the costs that would normally be recoverable under Rule 54. Okay. So how much beyond? Your Honor, I didn't calculate that. But they asked for things that were things like overtime for secretaries. Okay. So this is going to be knocked out. Was there a finding that they overloaded? I know there's the aspirin bottle, $5 for aspirin. Well, I think the fee request, the request for both fees and costs that was so excessive that the court thought that a reasonable response was denial of everything. I mean, and one of the cases that the court relied on, the Sham case, which I believe is out of the ---- I can't remember which circuit, but found that the excessive fee request could also result in a denial of costs. And even the citations that the plaintiffs submit say that if a fee request is, I can't remember the language used, but under certain circumstances even costs can be denied. Okay. On your supplemental, I haven't ---- I looked at your supplemental briefs that you filed with the district court. So when ---- is that when you came in and reduced the number to 90,000, or was that from the get-go? No, that was from the get-go, Your Honor. Okay. And on the supplemental briefing, that was just on the legal question? The supplemental briefing was at the hearing on the motion for attorney's fees, the district court raised the issue of that he thought that the request was excessive and that denial of fees altogether might be appropriate, and addressed the or told the parties to submit supplemental briefing and gave the parties some citations to some of the cases from the other circuits. Parties then submitted further briefing, and at that point the district court denied. And at that point, did the county argue that the sanctions should be zero fees? Yes, Your Honor. Based on the citations to the authorities that were provided by the court, we certainly took the position that a denial of fees was appropriate in this case. All right. I can see that my time is up unless the Court has any other questions. No. Thank you. Thank you. Your Honors, with the Court's permission, I'd like to begin with one statement that Why isn't it the case that if you come in with a super-inflated fee request that the you know, you're way above the limit and you forfeit your right to have any fees? Why shouldn't the court have that authority to do as the district court has supervised the whole trial? Well, we're not arguing that the court actually doesn't have that authority. What we're arguing is that the court has wide discretion when it comes to reducing what it considers to be an excessive fee award under the law of this circuit. The law of this circuit also says that the district court has narrow discretion when it comes to denying fees outright and that that should be done only according to the special circumstances test which has been laid out. What we object to is the fact that this court substituted what is essentially a balancing test, the special circumstances test, to try to arrive at a reasonable figure or if it felt like it needed to deny it outright, it could do that under Supreme Court authority. It substituted that test with a shots to conscience standard which is a punitive test. It is not a balancing test. And that punitive test is not appropriate for the facts in this case. As counsel just stated, this was an extreme departure from the norm, and we agree, particularly when we have a case where there was virtually no dispute in the number of hours. Both sides calculated the number of hours to be about 2,000 hours. There was virtually no dispute on the number of costs. The appellee below objected to about $2,400 in out-of-pocket costs in an effort to reach accommodation. Appellant wrote off all of those costs. So there is virtually no disagreement on either hours or costs in this situation. This is clearly not a situation that the Court would find in the Sham case, the Sham case, which was mentioned by counsel and cited by the district court. That's a Fifth Circuit court. How did this case wind up taking 2,000 or 2,400 hours? Well, Your Honor, this case ---- In other words, let me be more precise in my question, given the timing on this. The county could be in the position to say, yes, the way the case got litigated, let's say they say 2,000 hours of time, but it's really a 500-hour case. But given the way it got litigated, you know, big firm litigation tactics and all of that. So if the district court has that in mind, that's his mindset, that this was over-litigated and there seemed to be some suggestion in the Court's remarks, then why does ---- when you say there's no dispute about the number of hours, then no dispute in terms of the number of hours given the way it was litigated. Was that element involved here? Well, I don't think the record supports a conclusion that this was an over-litigated case. In fact, I think the record supports quite the opposite conclusion. This was extremely contentious litigation. In fact, the defendants served nearly 150 separate discovery requests on Mrs. Mendez. We were forced repeatedly to bring motions to compel to get evidence. There is in the record in the briefing a lot of discussion about these radio tapes, which required Mrs. Mendez to get not one but two motions to compel, and each time evidence was withheld by the defendants. And so when you look at the record in this case, certainly if, for instance, defendants would have simply admitted liability on the clear case of, say, Officer Reyes, this case would not have had to have been litigated the way it did. But that is not what happened here. There was very contentious litigation from the start. All right. I think my time is up. Thank you, Your Honor. All right. Thank you very much, counsel. Appreciate the argument.
judges: Trott, Hawkins, Fisher